**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KRISTAN DIAZ-CRUZ,** | : | Civil No. 1:11-CV-1302 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | (Magistrate Judge Carlson) |
| | : | |
| **DR. SYMONS, et al.,** | : | |
| | : | |
| Defendants | : | |

**MEMORANDUM OPINION**

## I.   FACTUAL BACKGROUND

The plaintiff, Kristan Diaz-Cruz, an inmate in the custody of the Pennsylvania Department of Corrections housed at SCI-Rockview, commenced this action *pro se* on July 13, 2011.  By October 2016, the lawsuit was reduced to three defendants and three legal claims, with Diaz-Cruz suing Dr. John Symons and Ted Williams, alleging that these defendants violated his rights under the Eighth Amendment to the United States Constitution through their deliberate indifference to his serious medical needs resulting from glaucoma, and negligently failed to provide the plaintiff with adequate vision care.  In addition, Diaz-Cruz alleged that a third defendant, Sergeant Thomas Rogers, retaliated against him for filing grievances and complaints by denying him

access to medication on two occasions and by transferring him to another cell within the prison.

On October 26, 2016, we issued an opinion and order granting summary judgment in favor of the defendants on Diaz-Cruz's medical negligence and deliberate indifference claims. (Docs. 218, 219.) This decision was informed by the uncontested factual record which revealed that on June 8, 2009, Diaz-Cruz was incarcerated at the Berks County Prison. (Id., ¶39.) He remained housed at that facility until February 9, 2010, when he was transferred to state custody. (Id., ¶67.) According to Diaz-Cruz when he was first incarcerated at the Berks County Prison, he was held in the prison's medical unit. (Id., ¶42.) Diaz-Cruz also avers that by September 29, 2009, while housed at this county jail, he was diagnosed with a central retinal vein occlusion, the principal medical complaint which he now alleges in his second amended complaint. (Id.,¶ 64.)

Diaz-Cruz was then transferred to state custody on February 9, 2010, and was housed at the State Correctional Institution (SCI) Rockview. (Id., ¶¶67-68.) Upon his arrival at SCI Rockview Diaz-Cruz was medically assessed by a physician assistant. (Doc.191, ¶ 12.) That assessment observed that Diaz-Cruz was diabetic, asthmatic, and suffered from hypertension. This initial assessment also determined

that Diaz-Cruz suffered from vision problems, and he was referred to the glaucoma clinic. (Id., ¶13.)

In the meanwhile, other medical arrangements were being made to address Diaz-Cruz's vision problems. Thus, Diaz-Cruz was identified by medical staff as having "a significant eye problem" and was referred to an outside medical group, Eye Consultants of Pennsylvania, for examination and treatment. (Id., ¶¶10-11.) Diaz-Cruz was also seen by a prison physician, the defendant, Dr. John Symons, on March 9, 2010. Dr. Symons, in turn, referred Diaz-Cruz's vision issues to two medical specialists, Dr. Marcovich, an opthalmologist, and Dr. Lanning, a retinal specialist. (Id., ¶14.) Both of these specialists examined and treated Diaz-Cruz over the ensuing months, prescribing medication for the plaintiff, and ultimately recommending that Diaz-Cruz receive surgery for his vision condition. (Id., ¶¶14-17.) That surgical procedure, a vitrectomy, was performed on Diaz-Cruz on April 12, 2012. (Id., ¶18.) Dr. Symons then retired in August of 2012 and played no further role in the care and treatment of Diaz-Cruz. (Id., ¶19.)

A review of prison medical records discloses the extensive nature of the care and treatment which Diaz-Cruz has received over the years for his vision problems. According to these records, between February 2010 and April 2012, Diaz-Cruz received approximately 20 appointments with physicians and specialists dedicated to

his vision issues. (Doc. 217.) At these appointments the plaintiff's eyes were examined; he received treatment and injections; and medical staff diagnosed his condition as one which resulted from a broken blood vessel which Diaz-Cruz suffered in September of 2009, prior to his incarceration in state prison. (Id.) Moreover, when Diaz-Cruz's condition declined significantly in March and April of 2012, he received prompt surgical care. (Id.) This level of care has continued to this day, with Diaz-Cruz receiving some 11 additional medical appointments for his vision between April 2012 and October 2016. (Id.)

Further, the undisputed factual record also contained information provided by the plaintiff which rebutted these legal claims. Specifically, Diaz-Cruz initially supported these medical claims by a certificate of merit submitted in January of 2013 by Dr. Terrance Baker. Dr. Baker's certificate of merit was the legal lynchpin of this malpractice claim. However, as this litigation progressed, Dr. Baker reassessed his views and withdrew this certificate of merit in January of 2016. As Dr. Baker observed:

> Discovery has been ongoing from January 2013 until today. Additional facts in evidence' include the deposition of John Symons, M.D. who was able to document, certify and provide medical records demonstrating that in fact the standards of care were met in providing glucose control during Mr. Diaz-Cruz's admission to the Rockview State Correctional Facility. Furthermore, Dr. Symons was able to demonstrate based upon personal knowledge and the review of the medical records that Mr.

4

> Diaz-Cruz did in fact receive adequate and appropriate ophthalmology follow-up after his transfer to the Rockview State Correctional Facility on or around 2/9/10. Based upon a reasonable degree of medical certainty, it is my opinion that the Rockview State Correctional Facility and Dr. John Symons, M.D., did use such care as reasonably prudent healthcare providers practicing in the same field in the same or similar locality would, have provided under similar circumstances. It is my opinion that no breaches in care caused Mr. Diaz-Cruz to experience a worsening of his severe retinal vein occlusion with macular engorgement. On admission to Rockview State Correctional Facility, Mr. Diaz-Cruz had already experienced severe injury to his vision as documented by eye exams prior to his transfer to the Rockview State Correctional Facility and confirmed by additional examination scheduled for him by Dr. Symons in April 2010. No progression or significant worsening of Mr. Diaz-Cruz's diabetes or vision occurred during this period of review from 2/9/2010 until late April 2010.

(Doc. 192, p. 10.)

Thus, as of January of 2016, the plaintiff's own medical expert had unequivocally stated based upon a review of all of the plaintiff's medical records, that "Diaz-Cruz did in fact receive adequate and appropriate ophthalmology follow-up after his transfer to the Rockview State Correctional Facility [and] that the Rockview State Correctional Facility and Dr. John Symons, M.D., did use such care as reasonably prudent healthcare providers practicing in the same field in the same or similar locality would, have provided under similar circumstances." (Id.)

We found that this medical opinion was fatal to Diaz-Cruz's malpractice claim, and related medical deliberate indifference claim, and concluded that Diaz-Cruz had

not cured this fatal defect in his case despite being given ample opportunity to do so. Instead, Diaz-Cruz simply offered a declaration from Doctor David Goldberg, a physician who treated him years prior to his incarceration. Dr. Goldberg's declaration, however, fell well short of what is needed under Pennsylvania law to sustain a medical negligence claim. In this declaration Dr. Goldberg simply stated that he was "available and willing to provide an medical opinion in this matter on Diaz-Cruz's behalf if and when I am called to do so." (Doc. 206.) Thus, Dr. Goldberg said he would appear, but provided no insight into what he might testify to, what his professional opinions might be or the basis of any opinions he may hold. This submission fell far below what is demanded by Pennsylvania law to support such a medical malpractice claim; that is, a declaration from an appropriate licensed professional that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm suffered by the plaintiff.

Given the complete collapse of Diaz-Cruz's proof supporting his medical claims, we granted summary judgment on those claims. (Docs. 218, 219.) Diaz-Cruz has now filed a motion asking us to reconsider these rulings. (Doc. 226.) For the reasons set forth below, we will decline this request and deny this motion.

## II. DISCUSSION

The legal standards that govern motions to reconsider are both clear, and clearly compelling. "The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985). Typically such a motion should only be granted in three, narrowly defined circumstances, where there is either: "(1) [an] intervening change in controlling law, (2) availability of new evidence not previously available, or (3) need to correct a clear error of law or prevent manifest injustice". Dodge v. Susquehanna Univ., 796 F.Supp. 829, 830 (M.D. Pa. 1992 ). As the United States Court of Appeals for the Third Circuit has aptly observed:

> "The purpose of a motion for reconsideration ... is to correct manifest errors of law or fact or to present newly discovered evidence." Max's Seafood Café, 176 F.3d at 677 (quoting Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir.1985)). "Accordingly, a judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." Id. (citation omitted).
>
> Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc., 602 F.3d 237, 251 (3d Cir. 2010).

Thus, it is well-settled that a mere disagreement with the court does not translate into the type of clear error of law which justifies reconsideration of a ruling. Dodge, 796 F.Supp. at 830. Furthermore, "[b]ecause federal courts have a strong interest in the finality of judgments, motions for reconsideration should be granted sparingly." Continental Casualty Co. v. Diversified Indus., Inc., 884 F.Supp. 937, 943 (E.D. Pa. 1995). Moreover, it is evident that a motion for reconsideration is not a tool to re-litigate and reargue issues which have already been considered and disposed of by the court. Dodge, 796 F.Supp. at 830. Rather, such a motion is appropriate only where the court has misunderstood a party or where there has been a significant change in law or facts since the court originally ruled on that issue. See Above the Belt, Inc. v. Mel Bohannon Roofing, Inc., 99 F.R.D. 99, 101 (E.D. Va. 1983).

In this case Diaz-Cruz cites no intervening change in the law or material new facts for use to consider. Thus, the legal grounds which typically justify a motion to reconsider are wholly lacking here. Instead, Diaz-Cruz's motion to reconsider seems to be premised on the notion that he may proceed to trial based upon the initial certificate of merit filed by Dr. Baker, even though the doctor has wholly repudiated that certificate of merit and, if called as a witness, would presumably now state as he has in his most recent submission that: "Diaz-Cruz did in fact receive adequate and

8

appropriate ophthalmology follow-up after his transfer to the Rockview State Correctional Facility [and] that the Rockview State Correctional Facility and Dr. John Symons, M.D., did use such care as reasonably prudent healthcare providers practicing in the same field in the same or similar locality would, have provided under similar circumstances." (Doc. 192, p.10.)

Given these facts, in our view, Diaz-Cruz's motion to reconsider fails for at least four reasons.

First, this motion ignores the fact that summary judgment in favor of the defendants is appropriate if Diaz-Cruz, as the non-moving party, provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Here, in light of Dr. Baker's recantation, Diaz-Cruz cannot meet even this minimal threshold at present. Rather, Diaz-Cruz is left asserting that he should be able to base his case upon efforts to impeach Dr. Baker's most recent opinion through his prior certificate of merit. Such an approach in our view is legally insufficient to defeat a summary judgment motion since "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy,

762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Second, the apparent premise of Diaz-Cruz's motion to reconsider is the idea that the plaintiff need only temporarily possess a certificate of merit, and the fact that this certificate of merit has been fully recanted does not affect the continuing viability of his legal claims. On this score, we disagree. In our view the only sensible way of reading Rule 1042.3's certificate of merit requirement is to conclude that a plaintiff must possess proof throughout the lawsuit that the defendants' conduct fell below generally acceptable standards of care. Indeed, to construe the rule in any other way would render it a nullity, since it would mean that possession of a certificate of merit for a single day would allow an otherwise meritless lawsuit to proceed forward for years. Because we regard this requirement as an on-going obligation of litigants, and find that Diaz-Cruz is no longer in compliance with the mandates of Rule 1042.3, dismissal of these medical claims is now appropriate.

Third, this motion fails because, at bottom, in this pleading Diaz-Cruz simply attempts to re-litigate and reargue issues which have already been considered and disposed of by the court. Dodge, 796 F.Supp. at 830. This is not a proper purpose for a motion to consider, and, therefore, the plaintiff's invitation to re-litigate these matters will be declined.

Finally, we conclude that there is no need to reconsider this decision in order to "prevent manifest injustice." Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc., 602 F.3d 237, 251 (3d Cir. 2010). Quite the contrary, granting the motion to reconsider would result in a manifest injustice since it would compel the medical defendants to face the time, trouble, upset and inconvenience of a trial to defend against claims that Diaz-Cruz's own expert witness now says are without merit. We will not impose this unfair burden upon the defendants through the rubric of a motion to reconsider.

### III.  ORDER

Accordingly, for the foregoing reasons, the plaintiff's motion to reconsider (Doc. 226.) is DENIED.

So ordered this 1st day of December 2016.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge